**[J-65-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| SAMSUNG FIRE AND MARINE INSURANCE CO., LTD (U.S. BRANCH); HARLEYSVILLE PREFERRED INSURANCE COMPANY | : No. 61 EAP 2024 : : Petition for Certification of Question : of State Law from the United States : Court of Appeals for the Third Circuit : at No. 23-1988 : v. : ARGUED: November 18, 2025 : RI SETTLEMENT TRUST; ACE : PROPERTY AND CASUALTY INSURANCE : COMPANY; NATIONWIDE MUTUAL : INSURANCE COMPANY; PHILADELPHIA : INDEMNITY INSURANCE COMPANY; : CAPITOL SPECIALTY INSURANCE : CORPORATION : : |

**OPINION**

**JUSTICE DONOHUE**            **DECIDED: July 21, 2026**

We granted a petition for certification[1] filed by the United States Court of Appeals

for the Third Circuit ("Third Circuit") to answer the following questions:

---

[1] Pennsylvania Rule of Appellate Procedure 3341 permits the United States Supreme Court or any United States Court of Appeals to "file a petition for certification with the Prothonotary of the Supreme Court" to resolve a question of Pennsylvania law. Pa.R.A.P. 3341(a). This Court may accept certification "only where there are special and important reasons therefor," including where "[t]he question of law is one of first impression and is of such substantial public importance as to require prompt and definitive resolution by the Supreme Court[.]" Pa.R.A.P. 3341(c)(1).

1. Does Pennsylvania have an "overriding public policy" against sex trafficking—as found regarding Schedule I controlled substances in *Minnesota Fire & Casualty Co. v. Greenfield*, 855 A.2d 854 (Pa. 2004), and as evinced by the state's anti-trafficking law, 18 Pa.[C.S.] § 3011(a)— such that an insurer's duty to defend and/or indemnify is abrogated when an insured is alleged to have enabled or profited from such trafficking?

2. If yes, is that duty abrogated whenever the insured's alleged conduct would constitute a violation of 18 Pa.[C.S.] § 3011(a), i.e., when the insured displayed an alleged mens rea of (1) "reckless[] disregard[]" that a person will be subjected to sexual servitude or (2) "knowingly benefit[ting] financially" from such activity, or is the duty abrogated only when an insured's conduct was allegedly "intentional," *cf. Erie Ins. Exch. v. Moore*, 228 A.3d 258 (Pa. 2020)?

*Samsung Fire & Marine Ins., Co., (U.S. Branch) v. RI Settlement Trust*, 49 EM 2024 (Pa. Oct. 8, 2024) (per curiam) ("Order Granting Certification Petition"). As to the first certified question, we hold that neither an insurer's duty to defend nor its duty to indemnify is abrogated on the basis of public policy when the insured is alleged to have enabled or profited from sex trafficking. While the General Assembly has expressed the Commonwealth's policy against sex trafficking by criminalizing it, the criminal statute does not provide a justification for the judicial crafting of an exception to insurance coverage in a policy otherwise silent on the subject. Given our resolution of the first certified question, we do not address the second certified question and return the case to the Third Circuit.

## I. Background

This case arises out of four separate civil complaints in which the respective plaintiffs ("Underlying Plaintiffs") alleged that, as minors, they were victims of human sex trafficking at various hotels in Philadelphia, Pennsylvania, including the Roosevelt Inn. Each plaintiff filed suit against, inter alia, UFVS Management Company, LLC, Roosevelt Motor Inn, Inc., and Roosevelt Inn, LLC (collectively, "Policyholders") as the owners,

operators, and managers of the Roosevelt Inn. The plaintiffs alleged that Policyholders, acting by and through their agents, were negligent in failing to stop sex trafficking from occurring at the Inn.

At the time of the alleged sex trafficking, Policyholders maintained primary-layer commercial general liability insurance for the Roosevelt Inn through various insurers, including Harleysville Preferred Insurance Company ("Harleysville"), Nationwide Mutual Insurance Company ("Nationwide"), and Samsung Fire and Marine Insurance Company ("Samsung").[2] Harleysville, Nationwide, and Samsung (collectively, "Insurers") each initially defended Policyholders in the underlying lawsuits subject to reservations of rights.

On October 10, 2018, Samsung instituted a declaratory judgment action in the United States District Court for the Eastern District of Pennsylvania, seeking a declaration that it had no legal duty to either defend or indemnify Policyholders in the underlying actions. Samsung argued, inter alia, that because the allegations against Policyholders, if true, would establish that they violated 18 Pa.C.S. § 3011 ("Human Trafficking Law"), it would be against public policy for Samsung to be forced to defend or indemnify Policyholders in the underlying actions. Samsung's Complaint, ¶¶ 55-64.

Policyholders filed an answer and counterclaim for declaratory judgment against Samsung, arguing that based on the allegations in the underlying complaints, Samsung was obligated to defend Policyholders in the underlying actions pursuant to the Samsung Policy. Policyholders' Answer and Counterclaim to Samsung's Complaint, 1/21/2020, ¶¶

---

[2] Harleysville provided Policyholders with commercial general liability insurance from April 1, 2011 through April 1, 2012. Policyholders' Fourth Amended Third-Party Complaint, 2/12/2020, ¶ 49 ("Policyholders' Complaint"). Nationwide provided Policyholders with commercial general liability insurance from April 1, 2012 through April 20, 2013. *Id.* ¶¶ 50-51. "Nationwide … is the successor by merger to Harleysville[.]" *Id.* ¶ 6. Samsung provided Policyholders with commercial general liability insurance from April 20, 2013 through April 20, 2015. Samsung's Second Amended Declaratory Judgment Complaint, 1/6/2020, ¶¶ 50-51 ("Samsung's Complaint").

66-73. Policyholders also filed a third-party complaint pursuant to Federal Rule of Civil Procedure 14 against Harleysville, Nationwide, and Ace Property & Casualty Insurance Company ("Ace"), seeking a declaration that Harleysville and Nationwide had a duty to defend Policyholders in the underlying lawsuits and that Ace's denial of coverage failed as a matter of law.[3]  Policyholders' Complaint, ¶¶ 90, 102.

The parties then filed respective motions for judgment on the pleadings.  While the motions were pending, two Policyholders—Roosevelt Inn, LLC and Roosevelt Motor Inn, Inc.—filed for bankruptcy, staying the case pursuant to 11 U.S.C. § 362.  RI Settlement Trust was established in the bankruptcy proceedings to serve as the entity assuming liability for all tort claims brought against Policyholders.

---

[3]  Ace provided commercial umbrella liability insurance to Policyholders from April 1, 2011 through April 20, 2014.  Policyholders' Complaint, ¶¶ 62-64.  Notably, the Ace Policy contains an exclusion for abuse or molestation, excluding coverage for

> 1. The actual or threatened abuse or molestation of any minor person by anyone while in the care, custody or control of any "insured", any employee of an "insured", or anyone acting on behalf of an "insured".  Abuse or molestation includes but is not limited to physical abuse, corporal punishment, sexual abuse, sexual molestation, or sexual misconduct by anyone; or
>
> 2. The negligent employment, investigation, supervision, reporting to the proper authorities or failure to so report, or retention of an person for whom any "insured" is or ever was responsible and whose conduct would be excluded by paragraph 1 of this endorsement.

Ace Policy – Abuse or Molestation Exclusion, 4/1/2011 – 4/1/2012 ("Abuse or Molestation Exclusion").

Despite the Abuse or Molestation Exclusion, Policyholders highlighted that Ace's Policy also states that "no exception to or limitation in this exclusion will apply unless 'underlying insurance' also provides the same exception or limitation[.]"  *Id.*  As neither the Harleysville nor the Nationwide Policy contained a similar exclusion, Policyholders argued that Ace's Abuse or Molestation Exclusion was not applicable.  Policyholders' Complaint, ¶¶ 79-80.

On March 20, 2023, upon the conclusion of the bankruptcy proceedings, the District Court granted Insurers' respective motions for judgment on the pleadings, granted Ace's motion to dismiss, and denied as moot Policyholders' motion for judgment on the pleadings. *Samsung Fire & Marine Ins., Co., (U.S. Branch) v. UFVS Mgmt. Co., LLC*, 2023 WL 2574971, at *9 (E.D. Pa. Mar. 20, 2023) ("*Samsung*") (non-precedential decision). Although Insurers argued that they did not have a duty to defend or indemnify based on the language of their respective policies, the court focused solely on whether Pennsylvania public policy would bar insurance coverage under the circumstances.[4] *Id.* at *5 ("Assuming, arguendo, that the policies trigger a duty to defend or indemnify, the [c]ourt would still have to decide the public policy question.").

In addressing this question, the District Court relied on *Minnesota Fire & Casualty Co. v. Greenfield*, 855 A.2d 854 (Pa. 2004) (Opinion Announcing Judgment of the Court)

---

[4] In addition to public policy, Samsung argued that Underlying Plaintiffs' injuries did not constitute an "occurrence" as defined by the Policy because "the injuries were not an 'accident,' were not fortuitous, and were the known and expected consequence of [Policyholders'] actions." Samsung's Complaint, ¶ 68. Samsung also argued that coverage was precluded based on the Policy's expected or intended injury exclusion, that Roosevelt Motor Inn, Inc. is not an insured, and that its Policy was not triggered by allegations in three of the underlying complaints because the events occurred in 2012, prior to its Policy becoming effective in 2013. *Id.* ¶¶ 69-83.

Harleysville and Nationwide similarly argued that the injuries did not constitute an occurrence under the Harleysville and Nationwide Policies, that the injuries did not constitute a personal and advertising injury as defined by the Policies, that the Policies' expected or intended injury exclusion barred coverage, and that the Policies' criminal act exclusion barred coverage. Harleysville and Nationwide Brief in Support of Motion for Judgment on the Pleadings, 3/12/2020, at 15-28.

Ace relied on Section 1 of its Abuse or Molestation Exclusion, *see* supra note 3, to argue that it had no duty to indemnify because the alleged injuries of Underlying Plaintiffs arose out of the sexual abuse of minors who were in the care, custody, and control of Policyholders. Ace's Brief in Support of Motion to Dismiss, 8/19/2019, at 13-19. Ace also argued that Section 2 of the Abuse of Molestation Exclusion barred coverage because Underlying Plaintiffs alleged that Policyholders "were negligent in failing to report, intervene, disrupt, or otherwise stop the practice of the sex traffickers." *Id.* at 19. Finally, Ace claimed that public policy barred coverage under the circumstances.

("*Greenfield* OAJC"), where a plurality of Justices found that, based on public policy, an insurer had no duty to defend or indemnify its insured in a civil suit where the insured was alleged to have sold heroin causing the death of an individual. Based on the *Greenfield* OAJC, the District Court suggested that "it may make public policy the basis of a judicial decision only 'in the clearest of cases.'" *Id.* (quoting *Greenfield* OAJC, 855 A.2d at 868 (quoting *Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755, 760 (Pa. 1994))). The District Court "strain[ed] to imagine a clearer case than the one presented here in which facts alleged indicate that Policyholders engaged in criminal conduct in violation of Pennsylvania's Human Trafficking Law." *Id.* The District Court reasoned that because sex trafficking has been "explicitly criminalized and has a high potential for abuse[,]" it is comparable to the sale of illegal drugs at issue in *Greenfield*. *Id.* (internal quotation marks omitted). The court observed that the Human Trafficking Law provides:

> **(a) Offense defined.**--A person commits a felony:
>
> > (1) of the first degree if the person recruits, entices, solicits, patronizes, advertises, harbors, transports, provides, obtains or maintains an individual if the person knows or recklessly disregards that the individual will be subject to sexual servitude;
> >
> > (2) of the first degree if the person knowingly benefits financially or receives anything of value from any act that facilitates any activity described in paragraph (1);
> >
> > (3) of the second degree if the person recruits, entices, solicits, advertises, harbors, transports, provides, obtains or maintains an individual if the person knows or recklessly disregards that the individual will be subject to labor servitude; or
> >
> > (4) of the second degree if the person knowingly benefits financially or receives anything of value from an act which facilitates any activity under paragraph (3).

18 Pa.C.S. § 3011.

The District Court explained that "[w]here an element involves a result of a person's conduct, such as here, a person acts knowingly if they are 'aware that it is practically certain that [their] conduct will cause such a result.'" *Samsung*, 2023 WL 2574971, at *8 (quoting 18 Pa.C.S. § 302). Based on the allegations in the underlying complaints, the District Court reasoned that Policyholders "ignored open and obvious signs of sex trafficking" and "knowingly benefitted from acts facilitating the trafficking scheme by renting rooms to traffickers despite the overwhelming evidence of the trafficking scheme."[5] *Id.* Even assuming that Policyholders "did not knowingly benefit[,]" the District Court opined that "at the very least, [they] looked the other way and feigned ignorance when confronted with clear indicia of sex trafficking." *Id.* Thus, the court concluded that there could be "no question that Policyholders harbored … [U]nderlying [P]laintiffs in reckless disregard of the sex trafficking that would result." *Id.* (footnote omitted). The District Court construed Policyholders' conduct as being "repugnant to Pennsylvania public policy" and reasoned that "shielding Policyholders from the consequences of their criminal conduct would be against the safety, morals, and welfare of the Commonwealth." *Id.* Therefore, the District Court held that Insurers did not have a duty to defend or indemnify Policyholders in the underlying actions.

---

[5] The court referenced the following allegations to support its finding:

> (1) rooms littered with used condoms; (2) men loitering outside of the hotel rooms; (3) rooms paid for in cash; (4) frequent refusal of housekeeping; (5) aggression directed at the young victims (approximately 14–16 years old) in public spaces; (6) young victims (approximately 14–16 years old) wearing sexually explicit clothing; (7) different men entering and exiting the hotel rooms; and (8) young victims (approximately 14–16 years old) exhibiting fear and anxiety in public spaces.

*Samsung*, 2023 WL 2574971, at *8.

Policyholders appealed to the Third Circuit, which petitioned this Court to grant review of two certified questions of Pennsylvania Law. In the petition, the Third Circuit perceived a tension between the policy of interpreting insurance contracts broadly in favor of coverage and the public policy against coverage where the underlying complaints allege "conduct so repugnant to society that it would violate overriding public policy[.]" Third Circuit Petition for Certification, 4/29/2024, at 6-8 (internal quotation marks omitted). The Third Circuit sought review of the certified questions, *see* supra p. 2, both of which we granted.

## II. *Greenfield*

Because the *Greenfield* OAJC is central to the first certified question, before addressing the parties' arguments, we pause to summarize it and the responsive opinions.[6] In *Greenfield*, Angela Smith and her friend went to the home of Michael Greenfield, who was under the influence of alcohol, marijuana, and heroin. *Greenfield* OAJC, 855 A.2d at 856. Greenfield, who had previously used heroin with Smith, provided Smith with a bag of heroin labeled "Suicide." *Id.* at 857. Smith injected the heroin and later died from an overdose. Police charged Greenfield in connection with Smith's death,

---

[6] The Greenfield Court consisted of six Justices as Justice Lamb did not participate in the case. *Greenfield* OAJC, 855 A.2d at 869. Justice Newman authored the OAJC, then-Justice Castille authored a concurring opinion, then-Justice Saylor authored a concurring opinion, and Chief Justice Cappy authored a dissenting opinion which Justice Nigro joined. Justice Castille explicitly stated in his concurring opinion that "I concur in the result of the lead opinion, but not its reasoning[,]" *id.* (Castille, J., concurring). Justice Saylor "join[ed] the [OAJC's] disposition and the core of its analysis, namely, that on the facts of this particular case, public policy may be invoked to deny a defense and indemnification under a homeowner's insurance policy for liability resulting from the criminal delivery and ingestion of a powerful narcotic substance such as heroin."). *Id.* at 871 (Saylor, J., concurring). The OAJC does not specifically state that Justice Eakin joined the OAJC or any of the other concurring or dissenting opinions. Therefore, at most, the OAJC represents the views of three Justices (Justices Newman, Saylor, and Eakin) of the six Justices hearing the case, making it a plurality opinion without precedential authority. *Williams v. City of Phila.*, 188 A.3d 421, 435 (Pa. 2018).

and he pleaded guilty to involuntary manslaughter, abuse of a corpse, and unlawful delivery of heroin.[7]

Subsequently, Smith's estate instituted wrongful death and survival actions against Greenfield, alleging that he was negligent in causing Smith's death. At the time of the incident, Greenfield was covered by a homeowner's insurance policy, which relevantly provided coverage for damages "caused by an occurrence[,]" and the policy further defined "occurrence" as "an accident." *Id.* at 858. The insurance policy also excluded coverage for bodily injury "which is expected or intended by the insured." *Id.* After the civil suit was brought, the insurance company filed a declaratory judgment action, alleging that it had no legal obligation to either defend or indemnify Greenfield because the allegations in the complaint were "premised solely upon the intentional and criminal act of the insured of selling heroin, a controlled substance." *Id.* The insurance company additionally argued that it had no legal duty to defend or indemnify Greenfield because public policy barred coverage under the circumstances. *Id.* at 859.

The trial court in *Greenfield* found that the insurance company had a duty to defend Greenfield because the record did not support that Smith's estate's claims were excluded under the insurance policy as a matter of law. *Id.* The Superior Court reversed, holding that the insurance company had no legal duty to defend or indemnify based on the doctrine of inferred intent[8] and public policy. *Id.* at 860. A plurality of this Court affirmed the Superior Court's judgment, although it disagreed with the intermediate court

---

[7] 18 Pa.C.S. §§ 2504, 5510; 35 Pa.C.S. § 780-113(a)(30).

[8] The Superior Court explained that "[i]nferred intent results when there is an intentional act on the part of the insured and it is inherent in that act that harm will occur." *Minnesota Fire & Cas. Co. v. Greenfield*, 805 A.2d 622, 624 (Pa. Super. 2002), *aff'd on other grounds*, 855 A.2d 854 (Pa. 2004). Applying this doctrine, the Superior Court concluded that while Greenfield may not have intended for Smith to die, "an overdose and death was one of the possibilities" and thus "the intent should be inferred." *Id.* at 627.

concerning the applicability of the doctrine of inferred intent under the circumstances, reasoning that "[j]urisprudence in Pennsylvania does not support the extension of inferred intent to cases other than exceptional ones involving child sexual abuse." *Id.* at 863. Even though Greenfield only sought allowance of appeal of the inferred intent question, the *Greenfield* OAJC proceeded to address the public policy issue, concluding that it supported the Superior Court's judgment based on its view that "recovery[9] is precluded for damages that arise out of an insured's criminal acts regarding a Schedule I substance, as a matter of overriding public policy." *Id.* at 866.

The *Greenfield* OAJC began its analysis of the public policy issue by discussing *Eisenman v. Hornberger*, 264 A.2d 673 (Pa. 1970), a case in which the Court rejected an insurer's argument to deny insurance coverage based on a purported public policy exception where the property damage at issue stemmed from the insured's commission of a crime. In *Eisenman*, two individuals illegally entered a home and stole liquor from the home. The burglars used matches for illumination while navigating the home and one of the burglars dropped a match which ignited the home. The homeowners brought a civil suit against the burglars. On appeal, the *Eisenman* Court first noted that "the insurance contract itself does not contain a 'violation of law' clause." *Id.* at 675. The *Eisenman* Court explained that because the insurer could have set forth "'a violation of law' clause in its policy, we are loath to insert such a clause for the greater protection of the insurer where we are not confronted with an overriding public policy which would so dictate." *Id.*

Distinguishing *Eisenman*, the *Greenfield* OAJC reasoned that "in situations when an insured commits a criminal act, with respect to a Schedule I controlled substance, and

---

9 While the *Greenfield* OAJC stated that "recovery" is precluded in these circumstances, in the next sentence, the opinion provides that under the circumstances, "public policy will not allow coverage under the contract of insurance." *Greenfield* OAJC, 855 A.2d at 866.

unintended or unexpected injuries or losses occur as a result, whether by accident or negligence, public policy will not allow coverage under the contract of insurance." *Id.* The OAJC was careful to limit its holding, explaining that

> in cases that do not involve a criminal act by an insured with respect to a Schedule I controlled substance, our decision in *Eisenman*, reiterating the test traditionally required for an insurer to disclaim liability; i.e. that the insurer must prove that the insured intended by his act to produce the damage which did actually occur, retains its validity.

*Id.*

The *Greenfield* OAJC acknowledged that *Eisenman* rejected the applicability of a public policy exception largely because the insurance policy at issue did not contain a violation of law exclusion. *Id.* Nonetheless, the OAJC downplayed the significance of the same omission in Greenfield's policy, explaining that "it is obvious that a homeowner's policy is not designed to protect a drug dealer from personal liability for supplying heroin that results in the death of his houseguest." *Id.* The OAJC explained that "[o]nly dominant public policy justifies the invalidating of a contract on the basis of public policy, and one such indication of that policy is statutory enactments." *Id.* at 867 (internal quotation marks omitted). The OAJC referenced the criminalization of Schedule I drugs; the lack of an accepted medical use of the drugs; and the lack of a safe mechanism for use under medical supervision. *Id.* Thus, despite the fact that the insurance policy did not contain a violation of law exclusion, the OAJC reasoned that "public policy demands that we [recognize a public policy exception] now and in every case where a loss has arisen from the insured's commission of a crime involving the sale, use, or possession of a Schedule I controlled substance." *Id.* Importantly, the OAJC noted that Greenfield pleaded guilty to unlawful delivery of heroin, involuntary manslaughter, and abuse of a corpse. *Id.* at 857.

The *Greenfield* OAJC also emphasized that both Greenfield and Smith violated the law and public policy because "possession, sale, and use of heroin are illegal." *Id.* at 869. Beyond Greenfield's illegal sale of heroin, the OAJC highlighted Smith's estate's inability to pursue a successful claim against the insured: "[p]ublic policy does not allow recovery under an insurance contract where a **willing and frequent participant** in this type of criminal activity **dies as a result**." *Id.* (emphasis added). It explained, "we will not countenance the turning of illegal activities regarding Schedule I controlled substances into money-making occasions." *Id.*

Justice Castille authored a concurring opinion, explaining that while he "d[id] not seriously doubt that considerations of public policy would warrant denying coverage" under the circumstances, he did not join the OAJC's reasoning. *Greenfield*, 855 A.2d at 869 (Castille, J., concurring). Justice Castille observed that because questions of public policy "require the judiciary to look to external, oftentimes subjective, and debatable matters, [the Court is] better serve[d] to confine [itself] to record-based decision-making, when such is possible." *Id.* at 869 n.2. Justice Castille explained that he would have decided the case based on "bedrock principles of contract construction" because "the deliberate conduct here, which would form the basis for homeowners' insurance liability, did not constitute an 'accidental occurrence' which would trigger coverage under the plain language of the policy." *Id.* at 869. Justice Castille reasoned that Greenfield's delivery of the heroin to Smith and Smith's decision to inject the heroin were both "deliberate and voluntary" actions. *Id.* at 870.

Justice Saylor also authored a concurring opinion, first explaining that he joined the "core" of the OAJC's analysis concerning public policy based "on the facts of this particular case[.]" *Id.* at 871 (Saylor, J., concurring). In Justice Saylor's view, invoking public policy did not "improperly or unfairly rewrite the [insurance] policy to correct the

absence of an appropriate exclusion, particularly since it cannot be reasonably maintained that the parties to the insurance contract anticipated that the homeowner's involvement in the drug overdose death of another would give rise to a covered risk." *Id.* Unlike Justice Castille, Justice Saylor would have found that the circumstances amounted to an accidental occurrence because there were no allegations that Greenfield expected or intended to cause Smith's death. *Id.* Ultimately, Justice Saylor agreed with the OAJC that the public policy discussion was limited to the "unique circumstances" of the case. *Id.* at 872.

Finally, Chief Justice Cappy authored a dissenting opinion, joined by Justice Nigro, disapproving of the OAJC's "decision to rewrite the insurance policy at issue." *Id.* (Cappy, C.J., dissenting). The Dissent explained that because the insurer "was capable of writing an exclusion which would exempt from coverage damages arising out of the sale of illegal narcotics[,]" it was not appropriate for the Court "to act as super-scrivener, correcting the apparent errors in business judgment committed by [the] insurer[.]" *Id.* The Dissent was also concerned that the OAJC's "underlying rationale" regarding the illegality of Schedule I controlled substances may be extended "to create exceptions for other illegal acts." *Id.* The Dissent distanced itself from the "broad and amorphous" notion that an insurer would not be required to cover any conduct deemed illegal by the General Assembly. *Id.* at 873.

### III. Parties' Arguments[10]

**Policyholders' Arguments**

The foundation of Policyholders' argument is that Pennsylvania has a "long-established public policy protecting a strong duty to defend based on a liberal construction of the allegations in the underlying complaint." Policyholders' Brief at 18. Policyholders

---

[10] Given that we answer the first certified question in the negative, we do not address the parties' arguments concerning the second certified question.

maintain that this expansive duty to defend is not abrogated by any public policy regarding sex trafficking where the underlying complaints involve "mere allegations that … Policyholders enabled or profited from criminally prohibited actions while … [P]olicyholders … engag[ed] in their ordinary, lawful business activities of operating a for-profit hotel." *Id.*

Specific to the duty to defend, Policyholders emphasize that it is a "distinct obligation, separate and apart from the insurer's duty to provide coverage." *Id.* at 19 (quoting *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc*., 2 A.3d 526, 542 (Pa. 2010)). According to Policyholders, the duty to defend is invoked "if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of this policy." *Id.* at 20 (quoting *Wilcox Co. v. Am. Nuclear Insurers*, 131 A.3d 445 (Pa. 2015)). Policyholders maintain that "coverage for similar negligence claims against businesses involving third parties' allegedly intentional conduct is routinely enforced in Pennsylvania courts, without ill effect on public policy, and notably, the Legislature over many decades has taken no action to discourage this." *Id.* at 21. Policyholders cite to *General Accident Insurance Co. of America v. Allen*, 708 A.2d 828 (Pa. Super. 1998), where the Superior Court held that an insurer had a duty to defend a wife in a civil action brought by victims of sexual abuse, claiming that she was negligent in failing to prevent her husband from committing the sexual abuse. *Id.* at 22 n.9. They also cite to our decision in *Donegal Mutual Insurance Co. v. Baumhammers*, 938 A.2d 286 (Pa. 2007), where we held that an insurer had a duty to defend the parents of an individual who shot and killed five people in a subsequent civil action brought by the estates of the deceased because the plaintiffs alleged that the parents were negligent in failing to prevent the crimes. *Id*. at 22 n.10.

Policyholders argue that the District Court took "an overly expansive approach to a public policy exception to the duty to defend" by relying on *Greenfield*, which, according to Policyholders, is "a narrow aberration presenting a rare and unique fact pattern that sharply divided the members of this Court." *Id.* at 26, 28. Unlike *Greenfield*, Policyholders explain that here, "the only criminal liability or mens rea that has been alleged is that of third-party sex traffickers; nothing has been established regarding any allegations about knowledge, intent, recklessness or negligence of … Policyholders." *Id.* at 29-30. Thus, Policyholders maintain that this case is not like *Greenfield* because Insurers are not being asked to defend "a criminal enterprise." *Id.* at 30. Policyholders further argue that "because [the General Assembly] has not criminalized the rent[ing] of hotel rooms in the same manner as heroin sales[,]" the Court should not invoke public policy to abrogate Insurers' contractual duties. *Id.* (citing *Greenfield* OAJC, 855 A.2d at 866-67 n.12). Policyholders emphasize that the *Greenfield* OAJC acknowledged it would be "loath to insert [a violation of law] clause for the greater protection of the insurer" absent a clear violation of criminal law and admission of the criminal conduct by the insured. *Id.* (quoting *Greenfield* OAJC, 855 A.2d at 867). Rather than extend *Greenfield*, Policyholders urge the Court to abide by *Greenfield*'s explicit limitation and reject Insurers' public policy argument.[11]

**Insurers' Arguments**

Insurers' overarching argument is that where the General Assembly criminalizes conduct that gives rise to an injury, "the defense or indemnification of an insured for its

---

[11] Policyholders also dispute the District Court's finding that the allegations, if true, constitute sex trafficking. Policyholders' Brief at 39-46. We decline to address this argument as it is beyond the scope of the certified questions. *See Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 327-28 (Pa. 2010) (explaining that we are not to proceed beyond certified questions so as to avoid "jurisdictional and prudential concerns").

civil liability violates Pennsylvania's public policy such that the insured may not offload the risk of its liability exposure to an insurer." Insurers' Brief at 19. Insurers rely primarily on *Greenfield* and highlight the OAJC's observation that the General Assembly criminalized the possession, sale, and use of heroin because of the harm it causes society. *Id.* (citing *Greenfield* OAJC, 855 A.2d at 868). Insurers draw a parallel between the prohibition of heroin and the prohibition of sex trafficking, suggesting that the Pennsylvania Human Trafficking Law "expresses a clear public policy mandate to eradicate the evils of human sex trafficking and to punish perpetrators—not simply the traffickers—but all those who facilitate, enable, or profit from trafficking and those who patronize the victims." *Id.* at 23.

Insurers argue that it would "undermine[] the intent of the Human Trafficking Law" if they were forced to defend and/or indemnify Policyholders because it would shield Policyholders "from the financial consequences of a judgment based on criminal conduct." *Id.* at 28. According to Insurers, like in *Greenfield*, the public policy of ensuring the "public health, safety, morals, and welfare of Pennsylvania citizens … abrogates an insurer's duty to defend or to indemnify when an insured is alleged to have harbored victims in reckless disregard of the fact that they are being trafficked or when an insured knowingly benefitted financially from sex trafficking." *Id.* at 29-30.

Insurers acknowledge that the *Greenfield* OAJC "confined the holding to the instance involving a sale of a Schedule I controlled substance[.]" *Id.* at 33. However, according to Insurers, this decision "soundly reflected the choice to conservatively apply a public policy rationale only to those facts before the [C]ourt instead of judicially re-writing the contract to include a violation-of-law clause for any situation where an insured breaks the law." *Id.* Similarly, here, Insurers ask the Court to fashion a limited holding on public policy grounds to make clear "that those who enable, condone, or profit from sex

trafficking, which contributes to the sexual exploitation of victims, cannot turn to their insurer for coverage." *Id.* Given that the General Assembly "has already announced the Commonwealth's public policy through the Human Trafficking Law," Insurers suggest that the question here is limited to "whether indemnification conflicts with or undermines legislative intent." *Id.* at 34.

**Policyholders' Reply**

In reply, Policyholders highlight that the Human Trafficking Law "is silent" on whether it creates a public policy that would abrogate the duty to defend and that there is "no evidence suggesting that any legislator anticipated that the new law would be interpreted by courts as silently or impliedly requiring courts to refuse to enforce defense obligations" in these circumstances. Policyholders' Reply Brief at 5-6. Policyholders reiterate their position that courts should not apply public policy to "defeat clear contractual expectations[,]" especially when an insurance company with superior bargaining power has the ability to draft exclusions to coverage. *Id.* at 6 (citing *Greenfield* OAJC, 855 A.2d 854; *Erie Ins. Exch. v. Moore*, 228 A.3d 258 (Pa. 2020)).

**Amici's Arguments**

Underlying Plaintiffs filed an amicus brief in support of Policyholders, arguing that the District Court's decision "dramatically overstated *Greenfield*'s non-precedential holding while dramatically expanding the public policy exception to an insurer's contractual obligations to indemnify and defend." Underlying Plaintiffs' Brief at 16. Underlying Plaintiffs maintain that the *Greenfield* OAJC "announced a public policy disallowing coverage only where both the insured **and** the decedent voluntarily engaged in criminal acts." *Id.* at 17 (emphasis in Brief). Given that Underlying Plaintiffs did not engage in criminal conduct, they argue that *Greenfield* should not apply. *Id.* at 17-18.

They also highlight that Greenfield pleaded guilty to his crimes while Policyholders have not been charged with any crimes. *Id.* at 18.

The National Association of Mutual Insurance Companies et al. ("NAMIC") filed an amicus brief in support of Insurers, reiterating Insurers' argument that sex trafficking is a serious issue which Pennsylvania has "taken extensive and broad measures to combat." NAMIC's Brief at 4. NAMIC argues that given the Human Trafficking Law's prohibition on sex trafficking, the Court has a legitimate basis in refusing to enforce an insurer's duty to defend when the insured is alleged to have engaged in the specified criminal conduct. *Id.* at 8.

The Complex Insurance Claims Litigation Association ("CICLA") also filed an amicus brief in support of Insurers. CICLA echoes Insurers' argument that based on *Greenfield*, Policyholders "cannot be insured if they facilitate[d] sex trafficking in violation of [the Human Trafficking Law]." CICLA's Amicus Brief at 13. According to CICLA, the General Assembly's "decision to criminalize recklessly disregarding or knowingly benefitting from sex trafficking demonstrates the overriding public policy against such conduct." *Id.*

## IV. Analysis

Resolving certified questions "is an unusual practice through which, for the sake of comity, we undertake to address legal issues outside the familiar setting of a case over which we maintain conventional jurisdiction." *Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 327 (Pa. 2010). While our scope of review in these matters is plenary, *id.* at 327, we are careful not to "proceed[] beyond the matters we are expressly asked to address" so as not to "raise[] both jurisdictional and prudential concerns which would immeasurably

compound the difficulties already associated with deciding multiple issues within a single case in a Court of seven members." *Id.* at 327-28.

The first certified question asks:

> Does Pennsylvania have an "overriding public policy" against sex trafficking—as found regarding Schedule I controlled substances in *Minnesota Fire & Casualty Co. v. Greenfield*, 855 A.2d 854 (Pa. 2004), and as evinced by the state's anti-trafficking law, 18 Pa.[C.S.] § 3011(a)—such that an insurer's duty to defend and/or indemnify is abrogated when an insured is alleged to have enabled or profited from such trafficking?

Order Granting Certification Petition.

We first discuss the duty to defend and the duty to indemnify to understand their place and purpose under Pennsylvania insurance coverage jurisprudence. An insurer's duty to defend its insured "arises when a complaint, on its face, alleges an injury that is at least potentially within an insurance policy's scope of coverage." *Kramer v. Nationwide Prop. & Cas. Ins. Co.*, 313 A.3d 1031, 1039 (Pa. 2024) (citing *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010)). The duty to defend "is a distinct obligation separate and apart from the insurer's duty to provide coverage." *Jerry's Sport Ctr.*, 2 A.3d at 541 (citing *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987)). While the duty to defend is triggered by allegations that potentially bring a claim within the scope of coverage, the duty to indemnify is only triggered when "the insured is held liable for a claim covered by the policy." *Gen. Acc. Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997). The duty to defend protects an insured's contractual right to be defended against claims of wrongdoing, whereas the duty to indemnify protects an insured where liability has been established and an adverse judgment has been entered.

Regarding the duty to defend, this Court has consistently held that "whether a claim against an insured is potentially covered is answered by comparing the four corners of

the insurance contract to the four corners of the complaint." *Jerry's Sport Ctr.*, 2 A.3d at 541 (citing *Baumhammers*, 938 A.2d at 290). Given the breadth of the duty to defend, "[a]n insurer may not justifiably refuse to defend a claim against its insured unless it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy." *Id.* This duty even extends to claims that are "groundless, false, or fraudulent" so long as the allegations possibly implicate coverage. *Id.* (quoting *Erie Ins. Exch.*, 533 A.2d at 1368).

Ultimately, even though the duty to indemnify is not formally triggered until an insured is found liable for a claim covered by an insurance policy, the duty to defend establishes "a conditional obligation to indemnify in the event the insured is held liable for a claim covered by the policy." *Allen*, 692 A.2d at 1095 ("Although the duty to defend is separate from and broader than the duty to indemnify, both duties flow from a determination that the complaint triggers coverage.").

Here, we proceed as though Insurers each have a duty to defend Policyholders based on the respective insurance policies. The District Court did not analyze Insurers' separate arguments that they had no duty to defend based on "the language of each respective policy (or relevant exclusions)[.]" *Samsung*, 2023 WL 2574971, at *5; *see* supra note 4. Instead, the District Court analyzed only the public policy issue, because, in its view, even if "the policies trigger a duty to defend or indemnify, the [c]ourt would still have to decide the public policy question." *Id.* Thus, in answering the first certified question, we assume, without deciding, that Insurers each have a contractual duty to defend.

Both the District Court opinion and the premise of the first certified question overstate the legal value of the *Greenfield* OAJC, which is a plurality opinion. *See Samsung*, 2023 WL 2574971, at *7; *see* supra note 6. "Plurality opinions, by definition,

establish no binding precedent for future cases." *Commonwealth v. McClelland*, 233 A.3d 717, 729 (Pa. 2020) (internal citations omitted). Therefore, the *Greenfield* OAJC does not control the outcome of the first certified question in any respect. To reach the result advanced by Insurers, we would first need to adopt the rationale of the three-justice plurality in *Greenfield* and then extend it beyond Schedule I controlled substances.[12] We decline the invitation.

Adopting Insurers' position and invoking public policy to abrogate insurance coverage otherwise extended to Policyholders would require us to divine an "overriding" public policy pronouncement by the General Assembly by virtue of its enactment of the Human Trafficking Law. We do not believe it is within the purview of this Court to rank the magnitude of the public policy underlying the various crimes defined in the Crimes Code.[13] It is sufficient for the work of the courts to know that the General Assembly has identified conduct it deems harmful and dangerous to the maintenance of an orderly society and criminalized it.[14] On the other hand, insurance carriers and their underwriters regularly weigh the risk of insuring the conduct of their insureds. We are confident that insurance carriers are capable of drafting insurance policies that exclude coverage for damages arising out of violations of these laws as they deem necessary in the exercise of their business judgment with premiums adjusted accordingly.

---

[12] In addition, to sync the facts of *Greenfield* with the allegations in the current complaints, we would also be required to extend the three-justice plurality opinion to Policyholders who were never convicted of nor admitted to the commission of the subject crime and where Underlying Plaintiffs are innocent victims of the alleged criminal violation.

[13] 18 Pa.C.S. §§ 101-9546.

[14] "It is the chief function of the General Assembly to set public policy[,]" and this Court is not "to substitute our own public policy judgments for those of the General Assembly." *Crawford v. Commonwealth*, 326 A.3d 850, 857 (Pa. 2024).

As is evident from the record, insurance policies with coverage exclusions based on the acts of insureds are regularly written and purchased.[15]  Notably, three justices in *Greenfield* would have resolved the coverage question before the Court by analyzing the insurance policy at issue, as is customary when analyzing the duty to defend.  *See Greenfield*, 855 A.2d at 869 (Castille, J., concurring); *id.* at 872 (Cappy, C.J., dissenting, joined by Nigro, J.).  To paraphrase Chief Justice Cappy's dissent, it is not appropriate for this Court to act as a "super-scrivener" to insert coverage exclusions that could have been made part of the insurance policy when drafted.  *Id.* at 873.  As we answer this certified question, we reiterate the well-established rule that whether an insurer has a duty to defend its insured is determined by "comparing the four corners of the insurance contract to the four corners of the complaint."  *Jerry's Sport Ctr.*, 2 A.3d at 541.

## V. Conclusion

For the reasons provided, we hold that neither an insurer's duty to defend nor its duty to indemnify is abrogated on the basis of public policy when the insured is alleged to have enabled or profited from sex trafficking.  Given our answer to the first certified question, we do not address the remaining question and return the case to the Third Circuit.

Chief Justice Todd and Justices Dougherty, Wecht, Mundy, Brobson and McCaffery join the opinion.

Justice Wecht files a concurring opinion in which Justice McCaffery joins.

---

[15]  *See* supra note 3.